## UNITED STATES *v.* ANDERSON.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF OREGON.

No. 705.  Argued February 26, 1913.—Decided April 7, 1913.

The prohibition in the Indian Appropriation Act of 1884, against sale of cattle purchased by the Government for the Indians without the consent of the Secretary of the Interior relates to all cattle purchased by the Government for Indians, and is not limited to such cattle as has been purchased from unexpended balances under another provision of the act.

The two provisions of the act above referred to are not interdependent.

Wholly distinct and non-related provisions of a general appropriation act should not be brought together and construed as one when such construction defeats the obvious purpose of the act and policy of the Government declared in that and other acts.

189 Fed. Rep. 262, reversed.

THE facts, which involve the construction of provisions in the Indian Appropriation Act of 1884 relative

to sale of cattle purchased by the Government for the Indians, are stated in the opinion.

*Mr. Solicitor General Bullitt* for the United States:

The transaction is within the letter of the act; that is, the cattle were really "purchased by the Government."

The cattle were purchased by the Secretary of the Interior pursuant to specific authority from Congress.

The cattle purchased by the Secretary of the Interior under the act of June 21, 1906, were "purchased by the Government" within the spirit and intent (as well as the letter) of the act of 1884, which prohibited outsiders from buying from the Indians any of their cattle "which have been purchased by the Government."

The object of the criminal provision was not to protect the government property but was to protect the Indians.

The criminal provision applies whether the title to the cattle be considered in the Government or in the Indians.

There is no difference between the Government's purchase of stock cattle for the benefit of the Indians out of surplus subsistence appropriations and its purchase for issuance to the Indians in exchange for ceded lands.

It has been the policy of the Government to prevent the whites from purchasing from the Indians cattle which have been issued to the Indians in exchange for ceded lands. Act May 1, 1888, 25 Stat. 113, 114; Act June 10, 1896, 29 Stat. 321, 355.

*Mr. Arthur C. Emmons* filed a brief for defendant in error:

The cattle were purchased with the Indians' money, and it makes no difference whether that money was the purchase price of his land or the purchase price of his labor.

The cattle were delivered to the Indians under and

pursuant to an agreement, and not by reason of an act of Congress.

The object of the criminal provision was not to affect cattle procured by the Indians with their own money or property.

The criminal provision does not apply to cattle unconditionally owned by the Indians.

There is no similarity between the government purchase of stock cattle for the benefit of the Indians out of surplus subsistence appropriations and its delivery of cattle to the Indians in part payment for the purchase of their land.

It has never been the policy of the Government to control the property acquired by the Indians either by his labor or the exchange of other property.

The acts of May 1, 1888, 25 Stat. 113, and of June 10, 1896, 29 Stat. 321, 355, show that special provisions were necessary in order to limit the ownership of the Indians.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

By the Indian Appropriation Act of July 4, 1884, c. 180, 23 Stat. 76, 94, the following general provision was enacted:

"That where Indians are in possession or control of cattle or their increase which have been purchased by the Government such cattle shall not be sold to any person not a member of the tribe to which the owners of the cattle belong or to any citizen of the United States whether intermarried with the Indians or not except with the consent in writing of the agent of the tribe to which the owner or possessor of the cattle belongs. And all sales made in violation of this provision shall be void and the offending purchaser on conviction thereof shall be fined not less than five hundred dollars and imprisoned not less than six months."

The United States brings this case directly here to review the action of the court below in sustaining a demurrer to an indictment charging the defendant in error with a violation of the provision just referred to on the ground that when rightly construed it did not embrace the acts charged in the indictment to have been committed in violation of its provisions.  The facts stated in the indictment as the basis of the charge were these:

"That on the 17th day of June, 1901, an agreement was entered into between an agent of the United States, to wit, James McLaughlin, who was then and there acting for and on behalf of the said United States, and the Klamath and Modoc Tribes of Indians and the Yahooskin Band of Snake Indians, all of which said Indians belong to the Klamath Indian Reservation, located in the State of Oregon, by the terms of which said agreement the said Indians ceded to the Government of the United States approximately six hundred thousand acres of land, for which said land the said United States was to pay to the said Indians the sum of $537,007.20 in the manner and form as follows, that is to say, $25,000 of the said amount was to be paid in cash to be distributed amongst the said Indians; $350,000 of the said amount was to be deposited with the Treasurer of the United States to the credit of the said Indians, which said last-named sum of money was to draw interest, and the interest thereof was to be disbursed to the said Indians in annual payments; that the remaining portion of the said $537,007.20, after the payment of attorneys' fees, was to be expended for the benefit of the said Indians, under the direction of the Secretary of the Interior, and upon request of the said Indians acting through the proper Indian agent for the following purposes; that is, in the drainage or irrigation of their land and in the purchase of stock cattle for issue to them, and for such other purposes as might in the discretion of the Secretary of the Interior, best promote

the welfare of the said Indians, including a reasonable
cash payment per capita not exceeding ten per centum
of the principal sum.

"That by the act of Congress approved June 21, 1906,
c. 3504, 34 Stats. p. 368, the said agreement was duly
ratified and the sum of $537,007.20 was appropriated out
of the money in the Treasury of the United States, for the
purpose of carrying into effect the aforesaid agreement,
it being provided that out of the sum so appropriated
'$350,000 shall be deposited in the Treasury of the
United States to the credit of said Indians, and the re-
mainder shall be expended as provided in the third article
of said agreement.'

"The grand jurors further find that, acting under
authority of the aforesaid agreement and the act of Con-
gress ratifying the same, the Indians of the Klamath
Indian Reservation made requisition through the United
States Indian agent in charge of said reservation, to the
proper officers of the Government for an issue of cattle
to be made to the said Indians, and thereafter the Indian
Department advertised in the manner provided by law
for the purchase of 4,500 heifers to be delivered at the
Klamath Agency for issue to the said Indians; that pur-
suant to the said advertisement and in conformity there-
with and after receiving proper bids, the Commissioner
of Indian Affairs did, on May, 1909, purchase of and from
one Wm. Hanley, of Portland, Oregon, 4,000 heifers,
which were delivered during the month of August, 1909,
to the superintendent of the Klamath Indian Reserva-
tion at Klamath Agency, Oregon, and thereafter payment
was duly made to the said Wm. Hanley from money
appropriated to carry into effect the aforesaid agreement.

"That after the cattle were duly delivered to the su-
perintendent of said Indian Reservation they were branded
with the United States Government brand and were
issued to the various Indians on said reservation who

were entitled thereto, and that each Indian upon receipt of his apportioned number of cattle branded the same with his own individual brand; that Frank Lynch and Elmer Lynch were two Indians residing on said Klamath Indian Reservation who were entitled to and who received cattle that had been purchased and issued in the manner aforesaid.

"And the grand jurors further find, allege, and present that O. T. Anderson on, to wit, the 24th day of October, 1910, in Klamath County, in the State and district of Oregon, and within the jurisdiction of this court, did then and there knowingly and unlawfully purchase of and from Frank Lynch and Elmer Lynch, who were then and there Indians living and residing within the limits of the Klamath Indian Reservation and wards of the Government, fifteen head of cattle, a more accurate description of which cattle is to the grand jurors aforesaid unknown, said cattle being then and there in the possession of the said Frank Lynch and Elmer Lynch, and which said cattle so purchased as aforesaid by the said defendant had been before that time bought by the Government of the United States and issued to the said Frank Lynch and Elmer Lynch in the manner heretofore set out in this indictment, and that the said O. T. Anderson, defendant above named at the time of so purchasing the said cattle from the said Indians was not a member of the tribe of Indians to which the said Frank Lynch and Elmer Lynch belonged, nor was he a member of any Indian tribe, and that the sale of said cattle of the said Frank Lynch and Elmer Lynch and the purchase thereof by the said O. T. Anderson, defendant as aforesaid, was without the consent in writing or otherwise by the agent in charge of said Indians, and that at the time of the purchase of said cattle by the said O. T. Anderson as aforesaid he, the said O. T. Anderson, well knew that the said Frank Lynch and Elmer Lynch were Indians and wards of the

Government of the United States and that the cattle so purchased by him had before that time been issued by the Government of the United States to the aforesaid Indians, contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America."

As we have said, the provision charged to have been violated was enacted as part of a general Indian appropriation bill. In such bill there was a clause authorizing the President to use "any sum appropriated for the subsistence of the Indians and not absolutely necessary for that purpose, for the purchase of cattle for the benefit of the tribe for whom such appropriation is made." 23 Stat., p. 97. Although this clause was not even by proximity associated with the provision here involved; indeed the two were separated by many intervening and entirely distinct provisions, and there was nothing from which otherwise the inference was deducible that they were intended to be associated, the court below thought, because they were in the same appropriation bill, it was essential to treat them as interdependent. Upon this premise as it was deemed that the sum of the unexpended appropriations was money of the United States, the inference was deduced that cattle bought with such money were the property of the United States after their delivery to Indians on a reservation and that only cattle so owned were covered by the prohibition against sale.

Coming to determine whether the facts stated in the indictment brought the case within the statute as thus interpreted, it was held that as the money with which the cattle embraced in the indictment were bought was Indian money, the price of land sold by them to the United States, the relation of principal and agent existed and hence the cattle when bought were acquired by the Indians through the United States as their representative, were owned by them and their sale was not within the

prohibition against sale. In addition this result was fortified by what was decided to be the intent of Congress in enacting the prohibition against sale, that is, the protection of the property of the United States and not the preventing the Indians on a reservation from selling their own cattle. But conceding without so deciding, the soundness of the inference deduced from the premise upon which the court proceeded, we are of opinion that error was committed in bringing together wholly distinct and non-related provisions simply because they were found in one general appropriation bill and thus interpreting the act not by its true text, but by an imaginary context. When the ambiguity produced by the erroneous consolidation is removed, the text is, we think, free from obscurity. The cattle bought under the conditions stated in the indictment were beyond doubt "cattle purchased by the United States" and which were on the reservation "in possession and control" of the Indian by whom it is charged they were wrongfully sold. The theory that the words possession and control contemplated only cattle which belonged to the United States cannot be indulged in without reading out the words forbidding the sale of cattle, in possession or control, to any one not a member "of the tribe to which the owners of the cattle belong." The fact that sales are not prohibited when made between members of the tribe, and the further fact that even the prohibited sales are permitted when made "with the consent in writing of the agent of the tribe to which the possessor or owner of the cattle belongs," demonstrates clearly that the purpose of the prohibition was not merely to protect cattle to which the United States had title as owner. This must be unless it be assumed that although the object of the legislation was to protect the title of the United States, the right to violate that title was freely permitted if only the wrong was accomplished by agreement of two or more Indians,

or was consented to by an Indian agent. And the right
which the statute thus recognizes in the members of a
tribe on the reservation to freely sell, among themselves,
cattle, even although they may have been in possession
or control as the result of a purchase made by the United
States, joined with the authority conferred upon the In-
dian agent, not only adds to the certainty of the plain
meaning of the text, but demonstrates the intent of the act,
that is, the public purpose of protecting the Indians on
the reservation and of keeping thereon cattle purchased
by the United States. · As suggested in argument by the
Government, we think this continuing public purpose
is cogently illustrated by the acts of May, 1, 1888, c. 213,
25. Stat. 113, 114, and of June 10, 1896, c. 398, 29 Stat.
321, 355, in both of which cattle bought for Indian·use
from the proceeds of the price of land ceded by the Indians ·
were subjected to a prohibition against sale like that
embodied in the statute under consideration. · Nor do
we think there is force in the suggestion made on the other
hand that the expression of the prohibition in the particu-
lar cases referred to must be taken as indicating that it
was deemed that the general prohibition of the statute
here involved did not apply to cattle bought under such
circumstances, otherwise the enactment of the special
prohibition was unnecessary. We say this since the con-
tention disregards the fact that in the two cases re-
ferred to the special legislation added to the restrictions
contained in the general law by subjecting the cattle in
the particular cases dealt with, not only to a prohibition
against sale, but also against exchange or slaughter of
such cattle, an extension of the prohibition of the general
law which presumably experience had demonstrated to
be essential to the efficient execution of the public pur-
pose which that law, as also the special provisions, were
intended to accomplish.

*Reversed.*