AUTRY v. ACOSTA, INC.



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:AUTRY v. ACOSTA, INC.

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 AUTRY v. ACOSTA, INC.
2018 OK CIV APP 8
410 P.3d 1017
Case Number: 115196
Decided: 11/14/2017
Mandate Issued: 02/07/2018
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2018 OK CIV APP 8, 410 P.3d 1017

 

CARRIE A. AUTRY, Plaintiff/Appellant,
v.
ACOSTA, INC., Defendant/Appellee.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE PATRICIA G. PARRISH, TRIAL JUDGE

REVERSED

Mark Hammons, HAMMONS, GOWENS, HURST & ASSOCIATES, Oklahoma City, Oklahoma, for Plaintiff/Appellant

W. Joseph Miguez, McGUIRE WOODS LLP, Austin, Texas, for Defendant/Appellee

JANE P. WISEMAN, JUDGE:

¶1 Carrie A. Autry appeals a temporary injunction enjoining her from (1) recruiting or hiring the employees of her former employer, Acosta, Inc., (2) using Acosta's confidential or proprietary information, or (3) soliciting or selling to named clients she represented while employed by Acosta. Was granting the temporary injunction to enforce the non-solicitation provision in question an abuse of discretion? We conclude it was, and reverse the order of the trial court.

FACTS AND PROCEDURAL BACKGROUND

¶2 In her June 2016 petition, Autry sought declaratory and injunctive relief against Acosta, alleging she resigned her employment with Acosta and was seeking employment with "Cruise Marketing, Inc., which [she] agrees is doing the same general kind of work as Acosta." Autry said Acosta threatened her with a lawsuit for violating or threatening to violate a non-compete clause in her contract with Acosta and that "Acosta is affirmatively attempting to interfere with [her] employment with Cruise."

¶3 The Non-Solicitation Agreement, dated December 1, 2008, provides in relevant part:

3. Non-Compete Restrictions. Employee agrees that during the term of Employee's employment with Acosta, Employee shall not, on Employee's own behalf or on behalf of others, in any capacity whatsoever, including, without limitation, as an owner, salesperson, sales manager, consultant or otherwise, directly or indirectly, engage[] in any other business that provides, in whole or in part, the same or similar services and/or products offered by Acosta as part of its Business. In the event of any violation by the Employee of this covenant against competition, the term of this covenant shall automatically be extended for a period of one (1) year from and after the later of: (i) the date upon which the Employee permanently ceases such violation; or (ii) the date of the entry by a court of competent jurisdiction of an order or judgment enforcing such covenant, but in no event shall the term of this covenant against competition be extended for a period beyond two (2) years from the date of termination of Employee's employment with Acosta.

Section 4 of the Non-Solicitation Agreement is titled "Non-Solicitation" and subsection (a) is titled "Business and Accounts." This subsection covers termination, both with and without cause. The "Termination of Employee for Cause" clause states:

Employee agrees that for a period of twelve (12) months following termination by Employee, for any reasons, including resignation, or by Acosta for Cause, Employee shall not, on Employee's own behalf or on behalf of others, in any capacity whatsoever, including, without limitation, as an owner, salesperson, sales manager, consultant, or otherwise, directly or indirectly, engage in the business of selling, soliciting, or promoting the sale of the Clients that Employee represented while employed by Acosta.

The Agreement also provides that Autry "shall not, directly or indirectly solicit or discuss with any employee of Acosta the employment of such Acosta employee by any other commercial enterprise other than Acosta" or attempt to recruit or hire, or recruit or hire an Acosta employee. The Agreement also covers confidential information.

¶4 In its answer, Acosta admitted some of Autry's allegations, denied others, and asserted as affirmative defenses unclean hands, estoppel, failure to state a claim, and the relief sought requires an improper advisory opinion. Acosta asserted counterclaims for breach of the Non-Solicitation Agreement by Autry's solicitation of Acosta's employees and established clients, breach of the Agreement's confidentiality provision, misappropriation of Acosta's proprietary business information, violation of Oklahoma's Uniform Trade Secrets Act, breach of fiduciary duty, tortious interference with prospective economic advantage, and conspiracy. Acosta asked for injunctive relief, a declaration that the Agreement is valid and enforceable, damages, and attorney fees and costs. Acosta also filed an application for a temporary restraining order and temporary injunction.

¶5 On June 23, 2016, the trial court announced it was entering a temporary restraining order directing Autry to refrain from (1) soliciting any Acosta employees, (2) sharing any electronic information or documents that she obtained from Acosta, and (3) directly soliciting any clients on a list titled "2016 Oklahoma bakery/deli clients."

¶6 The trial court held an evidentiary hearing on Acosta's request for a temporary injunction. Danny Ray Karst, senior vice-president and manager of Acosta, testified that MDS Foods, Reser's, and General Mills terminated their relationship with Acosta on May 23, 2016. Maple Hurst terminated its relationship with Acosta on May 31, 2016, and Eddy Packing did so on May 26, 2016. Autry resigned on May 20, 2016. Karst testified that other companies also terminated their relationships with Acosta.

¶7 Karst testified that Autry purchased an external hard drive in early April 2016 and "expensed it to the company and got reimbursed." When he asked why she purchased the hard drive, "She said she does a lot of work from home, and it is easier for her to do work from home with an external hard drive." He stated Autry had a company-issued laptop which she could use remotely for "full access to the Acosta share-point site."

¶8 During cross-examination, Karst testified that Acosta now has possession of the external hard drive. He admitted that, if Autry took the laptop home with her, she would have access to Acosta's information. He stated that although he had been told that Autry copied information to her home computer, he did not have personal knowledge that she did so or that she provided any of that information to Cruise Marketing. He stated that the two employees who reported directly to Autry left Acosta on the same day as Autry. Karst "agree[d] that Cruise Marketing is not subject to any contractual restraint on soliciting [Acosta's] employees." Karst testified he had personal knowledge that Autry conveyed Cruise Marketing's employment offers to the two former Acosta employees.

¶9 David Dunlevy, Autry's supervisor at Acosta, testified that Tina Genow and Samuel Shinn reported to Autry when they were employed by Acosta. Dunlevy stated that neither Genow nor Shinn individually submitted his or her resignation to him. Autry informed him on May 20, 2016, that she was leaving Acosta and Genow and Shinn were leaving too. Dunlevy testified that Autry sent an email on May 25, 2016, to Alfonso Castillo, who "is the person responsible for King's Hawaiian sales in Oklahoma" and asked him, "Have you made a decision on support?" Dunlevy said, "What this meant to me was that [Autry] was asking if King's Hawaiian was going to go to Cruise Marketing." Acosta offered exhibits containing offer letters from Cruise Marketing to Genow and Shinn. The offer letters were sent by Autry through her Acosta email address to Genow and Shinn on May 19th, before Autry resigned from Acosta.

¶10 Shinn testified that during the time he was employed by Acosta, Autry did not solicit him to leave Acosta for Cruise Marketing. He testified Jeff Lober solicited him to leave Acosta to work for Cruise Marketing. Autry did not negotiate his employment with Cruise Marketing, negotiate his terms of employment, or suggest or draft his employment contract terms. He stated he made his decision to go to work for Cruise Marketing before the written employment agreement was forwarded to him. He turned in his resignation to Autry because she was his boss. No one suggested that Shinn take information from Acosta.

¶11 He agreed that Autry sent him the job offer from Cruise Marketing on May 23, 2016. He submitted his resignation on May 20, 2016, before he received the offer letter. He stated he "knew what the offer was orally." He received his "first communication with Cruise Marketing about going to work for them" on April 26, 2016, and it was the third time the company that Cruise Marketing acquired, Food Marketing Resources, asked him to work for it. He stated he "pretty much committed fully" to going to work for Cruise Marketing on April 26th at a dinner attended also by Autry and Genow. Jeff Lober invited him to the dinner.

¶12 Genow testified Autry did not solicit her to leave her employment with Acosta to work for Cruise Marketing. She stated that Lober and another person solicited her to leave Acosta for Cruise Marketing. She had also already turned in her resignation when she received a written contract.

¶13 Genow stated that she had "forwarded e-mails to [herself] . . . from [her] desktop, which [she] did every year in tornado season." She stated, "Everything has since been returned to Acosta at their request." She claimed she has not retained any business information relating to Acosta and did not give any Acosta information to anyone outside Acosta.

¶14 She made her decision to leave Acosta on April 26, 2016, and she sent emails to her personal address on April 27, 2016, with the subject of "Reser's Tyson contracts, 2016." Two spreadsheets attached to the email were "[a]ccrual worksheets for Tyson products for Reser's and Wilson's Deli," which Genow created while employed by Acosta. She said she emailed herself documents every tornado season. Genow hand delivered her resignation letter to Autry. She denied trying to take a stack of papers relating to Tyson's Foods when she left Acosta's offices, and she denied Dunlevy's claim that he told her to put papers on the desk and leave them there.

¶15 Autry testified she worked for Acosta from November or December 2008 through May 26, 2016. She did not recall signing a non-compete agreement. She explained that when she went through orientation when Acosta acquired her employer, she and other employees were asked to sign documents, but the documents were not explained to them and she did not receive a copy of them. She stated that Lober contacted her about employment with Cruise Marketing. She had previously expressed to Dunlevy that she was not happy at Acosta. Cruise Marketing offered her employment at the April 26th dinner, and they reached an agreement on employment at the dinner. She denied sharing any Acosta information with Cruise Marketing.

¶16 She did not encourage Genow or Shinn to leave Acosta and did not help them negotiate the terms of their employment. She copied the information from her laptop to an external hard drive. When her external hard drive stopped working, she bought a new one. She immediately handed over the hard drive to Dunlevy when she left Acosta. She stated she did not use any of Acosta's electronic or paper documents while working for Cruise Marketing. She said, "There [are] no trade secrets in this business. It is just basically who puts in the most effort and who does the job better. There is no special knowledge." She did not save or copy the information from the external hard drive other than some emails.

¶17 Autry testified: "The day I turned in my resignation, I paid a courtesy call to the vendors that I had a longstanding relationship with so they would hear it from me and not on the street that I was leaving." She did not suggest whether the clients she called should stay with Acosta or go to another company. She testified she has not had any contact with the vendors she handled while she was employed by Acosta.

¶18 On cross-examination, she testified that at the time she accepted Cruise Marketing's job offer, she did not remember that she had a non-solicitation agreement with Acosta. Cruise Marketing asked her if she had a non-solicitation agreement and she told them she did not. She said she was sure she signed the agreement after looking at the document, but she did not recall signing it.

¶19 Autry testified she had talked to Lober in January or February about going to work for Cruise Marketing but she did not accept a job offer until the April 26th dinner. She never discussed bringing her existing book of Acosta clients with her to Cruise Marketing. Cruise Marketing sent her a written offer of employment to her personal email at the same time it sent offers to Genow and Shinn. Autry did not intend for the offers to be sent to Genow and Shinn through her Acosta email account. She admitted she sent emails from her Acosta account to her personal email account after she submitted her resignation. She also copied a list of contact information for all of her Acosta clients and some of her customers to her personal email address after submitting her resignation. She claimed it was for a meeting with one of her customers on June 20, 2016. She sent the list to Genow and sent a copy to her personal email address.

¶20 Lober testified that he and his partner recruited Genow and Shinn. He explained that Cruise Marketing had a 15-year relationship with Reser's in the Des Moines, Nebraska, Kansas City, and Springfield markets before Reser's left Acosta. He has not asked Autry to solicit any of Acosta's clients, and to his knowledge, she has not done so. He said, "We specifically asked her not to." He stated Autry has not provided any information from Acosta.

¶21 Lober testified that before Autry came to Cruise Marketing, there were "serious conversations" with some clients, like Reser's, that Cruise Marketing would start doing business with them in Oklahoma City. He stated that Maple Hurst was going to leave Acosta regardless of whether Autry worked for Cruise Marketing. He testified that if the court ordered Autry not to service her clients at Acosta, there would still be clients for her to work with at Cruise Marketing. However, he also stated that, although there are other clients, he "hired them to do a job." When asked if he hired Autry to service the other clients, he replied, "No, I didn't." He again acknowledged there would still be other lines to represent if Autry could not represent the clients she represented while employed by Acosta.

¶22 The trial court determined that good cause existed for issuing a temporary injunction. It enjoined Autry "from directly or indirectly soliciting, discussing, recruiting or hiring any employee of Acosta, Inc." It enjoined Autry "from utilizing any of Acosta, Inc.'s proprietary or confidential information." The court also enjoined Autry "from directly selling, soliciting, or promoting the sale of" the following clients she represented at Acosta:

BelGioioso, Bensons, Cargill, Churny, Cyrus O'Leary, Dawn Foods, Eddy Packing, FlatOut Breads, Family Fresh Pack, General Mills, Gonnella Baking Co., Harlan Bakeries, Hill & Valley Premium Bakery, James Skinner Baking Company ("J. Skinner"), King's Hawaiian, MDS Foods, Maplehurst Bakeries, Maple Leaf Foods, Nestle (including without limitation its Stouffer's brand), Otis Spunkmeyer, Prairie City Bakery, Prater's, Reser's Fine Foods, Sabra Dipping Co., Southeastern Mills, Stacy's Pita Chip Company, Superior Cake Products, and Tyson Foods (including without limitation its Sara Lee Bakery, Sara Lee Deli, and Wilson brands).

The trial court stated: "Article 4(a)(i) of Autry's Non-Solicitation Agreement with Acosta violates the provisions of 15 O.S. § 219A by its use of the word 'indirectly,' and further finds that that provision of the Non-Solicitation Agreement can be easily corrected to comply with 15 O.S. § 219A by deleting the word 'indirectly.'"

¶23 Acosta appeals the trial court's order. She filed a motion to stay the trial court proceedings, but not the temporary injunction, in which she "propose[d] that she will abide by the Temporary Order." The trial court denied the motion to stay. Autry then filed an application with the Supreme Court to stay the trial court proceedings pending appeal. The Supreme Court granted Autry's request for the stay.

STANDARD OF REVIEW

¶24 As an equitable matter, "[i]njunction is an extraordinary remedy and relief by this means should not be granted lightly." Dowell v. Pletcher, 2013 OK 50, ¶ 6, 304 P.3d 457. We review the grant or denial of an injunction to determine whether the trial court abused its discretion in making its decision. Murlin v. Pearman, 2016 OK 47, ¶ 17, 371 P.3d 1094. "Under an abuse of discretion standard, the appellate court examines the evidence in the record and reverses only if the trial court's decision is clearly against the evidence or is contrary to a governing principle of law." Id.

ANALYSIS

¶25 On appeal, Autry first asserts this Court should reverse the trial court's decision granting the injunction against soliciting customers, stating that the Non-Solicitation Agreement is invalid pursuant to 15 O.S. § 219A.

¶26 The Oklahoma Legislature has specifically provided that restraint of trade is void unless otherwise provided by statute. Title 15 O.S.2011 § 217 states: "Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, is to that extent void." (Footnote omitted.) Section 218 of Title 15, applicable to the sale of the goodwill of a business, and Section 219, addressing partnerships, are not applicable here. Section 219A, enacted in 2001, provides:

A. A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer.
B. Any provision in a contract between an employer and an employee in conflict with the provisions of this section shall be void and unenforceable.

15 O.S.2011 § 219A. Section 219B provides:

A contract or contractual provision which prohibits an employee or independent contractor of a person or business from soliciting, directly or indirectly, actively or inactively, the employees or independent contractors of that person or business to become employees or independent contractors of another person or business shall not be construed as a restraint from exercising a lawful profession, trade or business of any kind. Sections 217, 218, 219 and 219A of Title 15 of the Oklahoma Statutes shall not apply to such contracts or contractual provisions.

15 O.S. Supp. 2013 § 219B. Section 219B was enacted effective November 1, 2013.

¶27 The Non-Solicitation Agreement involved here provides:

Employee agrees that for a period of twelve (12) months following termination by Employee, for any reasons, including resignation, or by Acosta for Cause, Employee shall not, on Employee's own behalf or on behalf of others, in any capacity whatsoever, including, without limitation, as an owner, salesperson, sales manager, consultant, or otherwise, directly or indirectly, engage in the business of selling, soliciting, or promoting the sale of the Clients that Employee represented while employed by Acosta.

(Emphasis added.) The trial court found that the Non-Solicitation Agreement could be reformed to comply with § 219A simply by striking the term "indirectly." It also listed the clients Autry is enjoined from engaging in the business of "selling, soliciting, or promoting the sale of."

¶28 The Oklahoma Supreme Court has specifically instructed that "15 O.S. 2001 §219A is the Legislature's pronouncement on Oklahoma's public policy regarding covenants not to compete." Howard v. Nitro-Lift Techs., L.L.C., 2011 OK 98, ¶20, 273 P.3d 20 (reversed on other grounds by Nitro-Lift Techs., L.L.C. v. Howard, 568 U.S. 17, 133 S. Ct. 500, 184 L. Ed. 2d 328 (2012) (footnote omitted). The United States Supreme Court reversed the decision of the Oklahoma Supreme Court in Howard finding that it was for "the arbitrator to decide in the first instance whether the covenants not to compete are valid as a matter of applicable state law." Nitro-Lift Techs., L.L.C. v. Howard, 568 U.S. 17, 22, 33 S. Ct. 500, 504, 184 L. Ed. 2d 328 (2012). Although reversed on grounds pertaining to who had the authority under an arbitration provision to decide the non-compete covenants' validity--grounds unrelated to the merits of the dispute--the Oklahoma Supreme Court's decision in Howard remains the best pronouncement of that Court's instruction on the proper analysis of such non-solicitation agreements like the one under review.

¶29 The Howard Court explained § 219A:

Subsection A utilizes the mandatory term, "shall," in association with the employee's right to engage in the same or similar business as that of the employer while subsection B provides that "any" provision in a contract between the employer and employee conflicting with those terms "shall be void and unenforceable." The term "any" is all-embracing and means nothing less than "every" and "all." The plain, clear, unmistakable, unambiguous, and unequivocal language of 15 O.S. 2001 §219A prohibits employers from binding employees to agreements which bar their ability to find gainful employment in the same business or industry as that of the employer. The only exception allowed by the statutory provision is that the employee may be barred from soliciting goods or services from the employer's established customers.

Howard, 2011 OK 98, ¶ 21 (emphasis added & footnotes omitted).

¶30 The Supreme Court detailed the covenants at issue in Howard:

The covenants not to compete contain provisions, for the period of two years, prohibiting the employees from accepting employment with any oil or gas entity located in the United States which generates five percent (5%) of its gross revenues from nitrogen generation. The same clause prevents the employees from: "owning, managing, operating, joining, controlling or participating" in a similar business; being a director, officer, representative, partner, or consultant in any business engaging in nitrogen generation; loaning money to a like enterprise; or selling or leasing equipment to any person or business which has any significant portion of its business as nitrogen generation, whether or not the equipment is related to that particular portion of the business. The covenant conceivably could be interpreted to prevent the employees from taking jobs in any capacity from a competing business, even one not directly related to the nitrogen generation process. The agreement not only bars active solicitation of current customers or suppliers of Nitro-Lift, it also forbids the employees from approaching past customers and suppliers. Furthermore, it operates to inhibit the employees from employing or engaging any Nitro-Lift officer or employee even where those individuals might seek employment on their own initiative rather than from any intervention by the employees.

Id. ¶ 22 (emphasis added). The Supreme Court concluded: "The non-competition contracts go well beyond the bounds of what is allowable under §219A and violate the legislatively expressed public policy. Therefore, we hold that, pursuant to 15 O.S. 2001 §219A, the covenants not to compete are void and unenforceable as against Oklahoma's public policy expressed through legislative mandate." Id. ¶ 23.

¶31 We conclude the Non-Solicitation Agreement in the present case violates § 219A because it prohibits more than the direct solicitation of established clients. The Non-Solicitation Agreement prohibits Autry from directly or indirectly "engag[ing] in the business of selling, soliciting, or promoting the sale of the Clients that [Autry] represented while employed by Acosta." Section § 219A specifically allows an agreement between an employer and employee that prohibits the direct solicitation from the employer's "established customers." The trial court recognized this conflict and stated, "[T]he Non-Solicitation Agreement can be easily corrected to comply with 15 O.S. § 219A by deleting the word 'indirectly.'" We find that the remedy for this Non-Solicitation Agreement's shortcomings is not quite that simple and it cannot be made to comply with § 219A by merely deleting the word "indirectly."

¶32 The Non-Solicitation Agreement exceeds the permissible limitations of § 219A. It prohibits Autry from soliciting "Clients" Autry represented while employed by Acosta. This includes past clients, for instance, companies with whom Acosta or Autry no longer had a business relationship when Autry left Acosta. Autry had worked for Acosta since 2008. The Non-Solicitation Agreement would prohibit Autry from directly "selling, soliciting, or promoting the sale of" clients of her current employer who were former clients of Acosta, even if they left Acosta years before Autry changed employers. In Howard, the Supreme Court said:

Undoubtedly, the Legislature, in utilizing the term "established customer," had in mind those businesses and customers wherein a relationship was ongoing and anticipated to continue into the future.

Howard, 2011 OK 98, ¶ 26. This Non-Solicitation Agreement would extend to previous business customers Autry had represented even though Acosta had no current relationship with them when Autry left and were past clients with whom Acosta did not have an ongoing relationship and those it could not reasonably anticipate continuing a business relationship in the future.

¶33 In addition to striking the term "indirectly" in the Non-Solicitation Agreement, we would have to determine whether the phrase "Clients that Employee represented while employed by Acosta" conformed with the statutory term "established customer," and as in Howard,[1] "thereby suppl[ied] a material term of the contract." This conclusion is supported by the trial court's specific list of clients in its order which it enjoined Autry "from directly selling, soliciting or promoting," which in essence added material terms to the contract. Based on the holding of Howard, we decline to do so.

¶34 A party must prove the following to obtain an injunction: "1) the likelihood of success on the merits; 2) irreparable harm to the party seeking injunction relief if the injunction is denied; 3) his threatened injury outweighs the injury the opposing party will suffer under the injunction; and 4) the injunction is in the public interest." Dowell v. Pletcher, 2013 OK 50, ¶ 7, 304 P.3d 457. The party seeking an injunction must establish the right to injunctive relief "by clear and convincing evidence and the nature of the injury must not be nominal, theoretical or speculative." Id.

¶35 Based on our conclusion that the non-solicitation provision exceeds the restrictions allowed by § 219A, Acosta has not shown that any threatened injury it may suffer outweighs the injury to Autry from the injunction's restrictions. Examined under the lens of § 219A, the Non-Solicitation Agreement is void and unenforceable as against Oklahoma's public policy expressed by the Legislature's enactment of that section. And, based on the clear public policy reasons underpinning § 219A, the circumstances will not allow us to conclude that upholding this injunction is in the public interest. Accordingly, the temporary injunction granted by the trial court must be set aside.

CONCLUSION

¶36 The non-solicitation provision in question exceeds the restrictions permitted by 15 O.S.2011§ 219A. The temporary injunction entered on the basis of this unenforceable provision must be reversed.

¶37 REVERSED. 

THORNBRUGH, V.C.J., and BARNES, P.J., concur.

 

FOOTNOTES

[1] In Howard, the Supreme Court stated: "To conform with the restrictions of 15 O.S. 2001 §219A, we would have to determine whether the phrase 'present customers' within the agreement conformed to the Legislature's term 'established customer,' thereby supplying a material term of the contract." Howard v. Nitro-Lift Techs., L.L.C., 2011 OK 98, ¶ 27, 273 P.3d 20.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 2011 OK 98, 273 P.3d 20, HOWARD v. NITRO-LIFT TECHNOLOGIES, L.L.C.
Discussed at Length
 2013 OK 50, 304 P.3d 457, DOWELL v. PLETCHER
Discussed at Length
 2016 OK 47, 371 P.3d 1094, MURLIN v. PEARMAN
Discussed
Title 15. Contracts
 Cite
Name
Level

 15 O.S. 219A, Non-Compete Employment Contracts
Discussed at Length
 15 O.S. 219B, Non-Solicitation Contracts
Cited
 15 O.S. 217, Restraint of Trade Void
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA